COMMERCE, The (FITZHUGH v.). See Case No. 4,841.

COMMERCE, The (WHITTON v.). See Case No. 17,604.

## Case No. 3,055.

### The COMMERCEN.

[2 Gall. 261.][1]

Circuit Court, D. Massachusetts. Oct. Term. 1814.[2]

RIGHT OF NEUTRAL CARRIER TO FREIGHT.

1. A neutral cannot lawfully become the carrier of provisions for the supply of the army of one of the belligerents, although such army may be in a neutral country, and directly engaged in hostilities only against a third belligerent. See Maissonaire v. Keating [Case No. 8,978]. A neutral ship engaged in such traffic is not entitled to freight.

2. In what cases provisions are contraband. [See note at end of case.]

This was an appeal on the part of the captors from so much of the decree of the district court [of the United States for the district] of Maine, as allowed freight to the owners of this vessel which was restored as Swedish. She was captured on a voyage from Limerick in Ireland to Bilboa, carry-

[1] [Reported by John Gallison, Esq.]

[2] [Affirmed in The Commercen, 1 Wheat. (14 U. S.) 382.]

ing a cargo of grain, the property of British subjects, which appeared, from a letter found on board, to have been exported by the special permission of the British government for the supply of their army in Spain, and the shipper was required to produce a certificate of its being delivered for that use. The cargo was condemned in the district court.

Dexter & Kinsman, for captors.

It is of no importance to inquire, whether the cargo consisted of articles, which are usually contraband, or not. Within the true spirit and meaning of the laws of nations, they became contraband from the character of the voyage. Provisions, though not in their nature contraband, are yet made so by circumstances; as when on their way to a besieged place. Spain at this time was so far exhausted that provisions became as necessary, to enable the British to prosecute the war in that country, as they ever were to enable a besieged place to hold out. If, when shipped from one individual to another, they would have been contraband, how much more so in this case, where the shipment was made expressly for the use of a power at war with us, and by a permission, which in ordinary cases is rigorously withheld? Bynk. per Dupon, 111; 1 C. Rob. Adm. 296; 2 C. Rob. Adm. 186. Though the right of the neutral to freight is now generally admitted, yet there are not wanting respectable authorities in support of an opposite doctrine. Bynkershoek especially maintains, that the neutral ought to know the risk he takes, and to demand a rate of freight proportioned to it; and that, as he makes his own bargain, no freight ought to be allowed, unless he delivers his cargo at the port of destination. What is the reasoning opposed to this? It is founded entirely on the fiction, that the captor takes the place of the enemy shipper. This is not true. If it were, why should not the captor be bound by the contract for the purchase of the goods, if bought on credit, as well as by that for the carriage of them? The captor stands in the place of the enemy shipper as to rights only, but not as to duties. It may be said, that this is against authority; but we are bound by authority no further, than it has actually gone. The rule as to freight has been encroached upon in several instances. What reason can be given for the exceptions of the colonial or coasting trade, which will not apply, with equal or greater force to the present case? The reason usually urged is, that by such trade the commerce of the enemy is aided—a most feeble reason, compared with that, which exists in the case before the court. Here not only was aid afforded to commerce, but direct assistance was given in the prosecution of the war. That the army, for which these supplies were intended, was not acting against us, cannot affect the question. The

relief afforded to our enemy in his operations against one hostile power, left him at liberty to employ the greater resources against us. We may appeal to the very facts of the present case; for Lord Wellington's army, after being successful in Spain, was transported to the United States, and is at this moment making war upon our shores.

Mr. Prescott, for claimant.

The rule, which allows freight to the neutral carrier of enemy's goods, is ancient and well established. Though questioned by Bynkershoek, it is recognised by nearly all other writers on maritime law, and by the Consolato del Mare. It is founded upon the principle, that the rights of the neutral are no further to be interfered with, than may be necessary for the prosecution of the war. His lawful contracts are not to be disturbed, and among these is the employment of his ships in carrying the property of a nation in amity with him. The restrictions upon this right are accurately defined. He is to carry on no unlawful trade. The coasting trade, therefore, which relieves the enemy from the pressure of the war, is not allowed. The colonial trade also, is prohibited, upon the principle, whether just or not, that no trade is lawful in war, which is not permitted in peace. Contraband is the next case defined, and this ought not to be carried beyond its present extent, which is confined to articles in their nature warlike, or to such as become contraband from their being destined to a besieged place, or to a port of naval equipment. The articles, in the present case, were not in their nature contraband, nor was there any thing illegal in a neutral's carrying provisions to the British fleet in Lisbon, or elsewhere not on our coast. This does not resemble the case of destination to a known port of naval equipment. It is admitted, that the neutral might lawfully transport provisions to Lisbon or Bilboa for the supply of the inhabitants. Suppose then, that the master is directed to deliver his cargo to the commissary of an army there. It is the army of Spain, our friend. There can be no unneutral conduct toward us in carrying provisions to an army of our enemy employed in defending a country, with which we are in amity. The case might be different, if supplies were brought to an army hovering on our coast, or a navy blockading our harbors. No case has been, and none, it is believed, can be produced, in which neutral property has been confiscated under circumstances like the present. As to the argument, that the British army were aided, and thus the enemy enabled to employ a larger portion of his force against us, it is too remote to justify any conclusion from it, on the subject before the court.

STORY, Circuit Justice (after stating the facts). The general rule, that the neutral carrier of enemy's property is entitled to his freight, is now too firmly established, to admit of discussion. But to this rule there are many exceptions. If the neutral be guilty of fraudulent or unneutral conduct, or have interposed himself to assist the enemy in carrying on the war, he is justly deemed to have forfeited his title to freight. Hence the carrying of contraband goods to the enemy, the engaging in the coasting or colonial trade of the enemy, the spoliation of papers, and the fraudulent suppression of an enemy's interest, have been held to affect the neutral with the forfeiture of freight. And in cases of a more flagrant character, such as carrying despatches, or military passengers, for the enemy, or an engagement in the transport service of the enemy, or a breach of blockade, the penalty of confiscation of the vessel has been also inflicted. Bynk. Q. P. Jur. c. 14; The Sarah Christina, 1 C. Rob. Adm. 237; The Haase, Id. 236; The Emanuel, Id. 296; The Immanuel, 2 C. Rob. Adm. 186; The Atlas, 3 C. Rob. Adm. 299; The Rising Sun, 2 C. Rob. Adm. 104; The Madonna del Burso, 4 C. Rob. Adm. 169; The Neutralitet, 3 C. Rob. Adm. 295; The Weelvaart Van Pillaw, 2 C. Rob. Adm. 128; The Friendship, 6 C. Rob. Adm. 420.

By the modern law of nations, provisions are not, in general, deemed contraband; but they may become so, when the property of a neutral, on account of the particular situation of the war, or on account of their destination. The Jonge Margaretha, 1 C. Rob. Adm. 189. If destined for the ordinary use of life in the enemy's country, they are not, in general, contraband; but it is otherwise, if destined for military use. Hence, if destined for the army or navy of the enemy, or for his ports of naval or military equipment, they are deemed contraband. Id. Another exception from being treated as contraband, is when the provisions are the growth of the neutral exporting country. But if they be the growth of the enemy's country, and more especially if the property of his subjects, and destined for the enemy's use, there does not seem any good reason for the exemption; for, as Sir William Scott observes, in such case, the party has not only gone out of his way for the supply of the enemy, but he has assisted him by taking off his surplus commodities. The Jonge Margaretha [supra]. But it is argued, that the doctrine of contraband cannot apply to the present case, because the destination was to a neutral country. And it is certainly true, that goods destined for the use of a neutral country can never be deemed contraband, whatever may be their character, or however well adapted to warlike purposes. But if such goods are destined for the direct and avowed use of the enemy's army or navy, I should be glad to see an authority, which countenances their exemption from forfeiture, when the property of a neutral. Suppose a British fleet were

now lying in a neutral port, would it be lawful for a neutral to carry provisions or munitions of war there, avowedly for the exclusive supply of such fleet? Would it not be a direct interposition in the war, and an essential aid to the enemy in his hostile preparations? In such a case, I should imagine the goods, if the property of a neutral, had the taint of contraband, in its most offensive character, on account of their destination, and that the mere interposition of a neutral port would not protect them from forfeiture. I agree, however, that strictly speaking this is not a question of contraband, for that can arise only when the property belongs to a neutral, and here the property belonged to an enemy, and therefore was liable, at all events, to condemnation. But was the voyage lawful, and such as the neutral could, with good faith, and without a forfeiture of his character, engage in? It has been solemnly adjudged, that being engaged in the transport service of the enemy, or in the conveyance of military personages in his employ, are acts of hostility, which subject the property to confiscation. The Friendship, 6 C. Rob. Adm. 420; The Orozembo, Id. 430; The Carolina, 4 C. Rob. Adm. 356. And the carrying of despatches, from the colony to the mother country of the enemy, has subjected the party to the like penalty. The Atalanta, 6 C. Rob. Adm. 440; The Constantia, Id. 461, note. And in these cases, the fact, that the voyage was to a neutral port, was not thought to change the character of the transaction. The principle of these determinations was asserted to be, that the party must be deemed to place himself in the service of the hostile state, and assist in warding off the pressure of the war, or in favoring its offensive projects.

Now I cannot distinguish these cases, in principle, from that before the court. Here is a cargo of provisions exported from the enemy's country with the avowed purpose of supplying the army of the enemy. The Antonio Johanna, 1 Wheat. [14 U. S.] 159; The Friendschaft, 4 Wheat. [17 U. S.] 105; 1 Kent, Comm. 140. Without this destination, they would not have been permitted to be exported at all. Can a more important or essential service be performed in his favor? In what does it differ from the case of a transport in his service? The property nominally belongs to individuals, and is freighted apparently on private account, but in reality for public use, and under a public contract, implied from the very permission of exportation. It is in vain to contend, that the direct effect of this voyage was not to aid British hostilities against the United States. It might enable the enemy indirectly to operate with more vigor and promptitude against us, and increase his disposable force. But it is not the effect of the particular transaction, that the law regards. It is the general tendency of such transactions to assist the military operations of the enemy, and the temp-

tation which it presents to deviate from a strict neutrality. Nor do I perceive how the destination to a neutral port can vary the application of the rule. It is only doing that indirectly, which is prohibited in a direct course. Would it be contended, that a neutral might lawfully transport provisions for the British fleet and army, while they lay at Bourdeaux, preparing for an expedition to the United States? Would it be contended, that he might lawfully supply a British fleet stationed on our coasts? I presume, that two opinions could not be entertained on such questions; and yet, though the cases put are strong, I do not know, that the assistance is more material, than may be supplied under cover of neutral destinations like the present. On the whole, I am of opinion, that the voyage, in which this vessel was engaged, was illicit, and inconsistent with the duties of neutrality; and I think it is a very lenient administration of justice, to deny the neutral master his freight.

The decree of the district court is reversed, so far as it allows the freight; and as to the residue is affirmed.

Affirmed in the supreme court ([The Commercen] 1 Wheat. [14 U. S.] 382); Washington, Story, Todd, and Duvall, JJ., concurring: Marshall, C. J., Livingston, and Johnson, JJ., dissenting.

[NOTE. The opinion for affirmation, delivered by Mr. Justice Story in the supreme court, was substantially the same as the foregoing.]